# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-00747-SCT

*JOSH KIRK DAVIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/12/2002 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WESLEY THOMAS EVANS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/17/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE McRAE, P.J., WALLER AND COBB, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Josh Kirk Davis was indicted and convicted of murder in the Yazoo County Circuit Court for the shooting death of William "Bubba" Arnold. Finding no reversible error, we affirm the conviction and sentence of life imprisonment.

## FACTS AND PROCEDURAL HISTORY

¶2.     During the night of July 29, 2000, and the early hours of July 30, 2000, William Arnold, 15-year-old Josh Kirk Davis, Blake McNeer, Megan Smith, Michelle Campbell, and Nicki Campbell were at a deer camp in rural Yazoo County, Mississippi, fishing and swimming in a nearby lake. While Davis,

McNeer, Smith, and Michelle Campbell were swimming in the lake, the 46-year-old Arnold allegedly made unwelcome sexual advances toward 17-year-old Nicki Campbell.

¶3.     Upon learning of Arnold's advances toward Nicki Campbell, McNeer confronted Arnold, and Arnold brandished a shotgun and demanded the group leave the property. The group then went to Michelle Campbell's house where, a little later, Mike Campbell, who is Michelle's father, and Clifton Campbell, who is Mike's brother and Nicki's father, returned from a night out. Shortly thereafter, Michelle and Davis informed Clifton of what had occurred earlier between Arnold and his daughter, Nicki. Clifton became enraged and left Mike Campbell's house with Davis. In the meantime, Megan and Michelle had left the house and returned to find Clifton and Davis gone.

¶4.     Clifton and Davis traveled to the camp where, according to Davis, Clifton pointed a shotgun at him and ordered him to fire into the camp cabin where Arnold was sleeping. Davis took the shotgun and, with Clifton pulling aside the blinds in the door as the door's glass was missing, fired three shots. Davis admitted to firing into the camp cabin in his third statement to police. The shotgun blasts struck Arnold in the face, producing massive injuries and killing him instantly.

¶5.     After Megan and Michelle returned to find that Clifton and Davis had already left Mike Campbell's house, they drove out to the camp where they found Clifton and Davis running from the camp with Clifton holding a shotgun. The two girls then left and returned a short time later to Mike Campbell's house. Michelle testified that when she questioned Davis about what happened, he said, "I shot him. I shot that mother ****er three God damn times."

¶6.     Megan, Michelle and Davis returned to the camp cabin where they found Arnold lying on the couch. The three returned to Mike Campbell's house, and Davis repeatedly professed his innocence.

2

¶7. Both Davis and Clifton were charged with capital murder with the underlying felony being burglary. After severance, Davis was tried alone and convicted of murder less than capital in a three-day trial. He was subsequently sentenced to life imprisonment. Davis appeals, arguing the trial court erred in refusing to grant a manslaughter instruction, erred in admitting into evidence the gruesome photographs of Arnold's body, erred in refusing to grant a directed verdict, and that co-counsel rendered ineffective assistance of counsel.

## DISCUSSION

**I.       WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GRANT A MANSLAUGHTER INSTRUCTION BASED UPON THE EVIDENCE.**

¶8. Davis argues that the trial court erred in denying a manslaughter instruction because the killing occurred in the heat of passion in that Arnold's sexual advances toward Nicki supposedly enraged both Davis and Clifton. The requested manslaughter instruction, D-8, provided, in pertinent part:

> If you find from the evidence in this case beyond a reasonable doubt that JOSH DAVIS and no other person on or about July 30, 2001 [actually 2000] in YAZOO County acting in the heat of passion or with culpable negligence effect the death of William Arnold, then you shall find the defendant guilty of manslaughter.

(emphasis in original).

¶9. A defendant is entitled to have jury instructions given presenting his theory of the case, but a proposed instruction can be refused if it incorrectly states the law, is fairly covered elsewhere in other instructions, or is without foundation in the evidence. *Poole v. State*, 826 So. 2d 1222, 1230 (Miss. 2002); *Jones v. State*, 797 So. 2d 922, 927 (Miss. 2001); *Adams v. State*, 772 So. 2d 1010, 1016 (Miss. 2000); *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998).

3

¶10. In the instant case, there was no factual basis for a manslaughter instruction. The State is correct that any initial passions had cooled and that deliberation and malice had set in. After the youths had returned from the camp, Nicki and McNeer, the person who confronted Arnold about his advances toward Nicki, each went to sleep. Mike and Clifton did not arrive at the house until approximately 30 to 45 minutes later, and the drive back to the camp took about an additional 15 to 20 minutes. Furthermore, Arnold was killed while he was asleep. Davis was also not related by blood to Nicki and Clifton. Given the amount of time that transpired, any heat of passion, assuming such was even present to begin with, cooled into deliberation and malice. This assignment of error is without merit.

## II. WHETHER THE TRIAL COURT ERRED BY ADMITTING CERTAIN PHOTOGRAPHS OF THE CRIME SCENE.

¶11. Davis next argues that photographs of Arnold were unduly gruesome and served only to prejudice and inflame the jury. Four of the disputed photographs depicted the interior of the camp cabin and the location and relation of Arnold's body to the interior and blood splatters on the wall and floor. Two other photographs were taken during the autopsy each of which depict the injuries to each side of Arnold's face and head. The State counters that the trial court correctly admitted the photographs because they showed the nature and extent of the injuries Arnold sustained and the circumstances surrounding the incident.

¶12. We will not reverse a trial court's decision to admit photographs of a murder victim's body unless the court abused its discretion. *Simmons v. State*, 805 So. 2d 452, 485 (Miss. 2001) (citing *Gray v. State*, 728 So. 2d 36, 57 (Miss. 1998)). We have likewise held that a trial judge's discretion to admit such photographs is nearly limitless regardless of the gruesomeness and repetitiveness. *Woodward v. State*, 726 So. 2d 524, 535 (Miss. 1997). Photographs of a victim have evidentiary value where they "1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location

4

of the body and cause of death; and 3) where they supplement or clarify witness testimony." ***Westbrook v. State***, 658 So. 2d 847, 849 (Miss. 1995) (citations omitted). *See also **Neal v. State***, 805 So. 2d 520, 524 (Miss. 2002); ***Jones v. State***, 776 So. 2d 643, 652 (Miss. 2000).

¶13.    Here, there is no indication that the prejudicial value of the photographs outweighed their probative value.   They served the legitimate evidentiary purpose of depicting the angles and trajectories of the gunshots about which Dr. Steven Hayne, the forensic pathologist who performed the autopsy, testified, and they did not to inflame the jury.  *See, e.g.*, ***McDowell v. State***, 813 So. 2d 694, 699 (Miss. 2002); ***Stevens v. State***, 808 So. 2d 908, 926 (Miss. 2002); ***Drake v. State***, 800 So. 2d 508, 515-16 (Miss. 2001); ***Milano v. State***, 790 So. 2d 179, 191 (Miss. 2001).  This assignment of error is without merit.

### III.    WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A DIRECTED VERDICT.

¶14.    Davis argues the State never proved he was involved in the murder of Arnold.  He further argues that there was no physical evidence placing him at the crime scene.

¶15.    Motions for directed verdict challenge the sufficiency of the evidence supporting the verdict. ***Bridges v. State***, 807 So. 2d 1228, 1231 (Miss. 2002); ***Smith v. State***, 802 So. 2d 82, 86 (Miss. 2001); ***Holmes v. State***, 798 So. 2d 533, 537 (Miss. 2001); ***Mallard v. State***, 798 So. 2d 539, 542 (Miss. 2001).  When passing upon such a motion, all of the State's evidence is accepted as true with inferences that can be drawn therefrom, and if the evidence is sufficient to support the verdict of guilty, the motion for directed verdict must be denied.  ***Hill v. State***, 774 So. 2d 441, 447 (Miss. 2000); ***Fleming v. State***, 732 So. 2d 172, 182 (Miss. 1999); ***Stevenson v. State***, 733 So. 2d 177, 183 (Miss. 1998); ***Mamon v. State***, 724 So. 2d 878, 881 (Miss. 1998); ***Wall v. State***, 718 So. 2d 1107, 1111 (Miss. 1998).

¶16.    Here, there was sufficient evidence to support the verdict.  Davis admitted to law enforcement in his third statement on August 1, 2000, that he fired three shots into the camp cabin where Arnold was sleeping while Clifton held the blinds aside.[1]  Both Megan Smith and Michelle Campbell saw Davis running from the camp with Clifton, and both testified he told them he fired the three shots.  Michelle also testified that Josh stated, "I shot him.  I shot the mother f\*\*ker three God damn times."  This assignment of error is without merit.

### IV.    WHETHER CO-COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL DURING CLOSING BY REVEALING STATEMENTS IN VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE.

¶17.    Davis's appellate and trial counsel, Wesley Evans, argues that statements made by trial co-counsel Michael Rushing violated Davis's attorney-client privilege and totally contradicted Davis's trial strategy that Clifton fired the fatal gunshots.  The pertinent statements are as follows:

> Now we've got Josh's three statements, and y'all can read them for yourself.  Y'all are intelligent folks, and I want you to do that, especially the third one where Josh incriminates himself at least to the extent of saying he fired the three shots, but, at the same time, he provides his defense, which the State cannot counter.  They have no testimony or evidence to counter the defense that the gun was put to his head and he was threatened with his life.  but I've got a statement here that's not into evidence, but it's my work product, and I'm going to read it to you.  It's very brief. . . .
>
> THE COURT:  Five minutes.
>
> MR. RUSHING:  Okay.  It's from August 29th, 2000.  Interview: "Josh Davis at Holmes County jail."  These are my notes on my initial full interview with Josh.

---

[1]As stated before, the window in the door to the camp was missing its glass.

[DA] POWELL: Your honor, we're going to object to Mr. Rushing reading his notes from an interview. There's nothing in evidence about that.

THE COURT: Sustained.

MR. RUSHING: I can read my statement, my closing statement.

THE COURT: Let's approach the bench.

(AT BENCH OUT OF HEARING OF JURORS)

THE COURT: You can't read anything that is not a part of the evidence that the defense –

MR. RUSHING: I can't talk about it?

THE COURT: Not unless it came out as evidence in this trial.

MR. RUSHING: It's exactly the same as his third statement.

THE COURT: If it is the same, then you can testify, but you can't testify if this is something that came out of an interview that you had with him, because it's not in evidence.

MR. RUSHING: Okay. I understand.

(END OF BENCH CONFERENCE)

MR. RUSHING: Well, I'm not going to read you the statement, but suffice it to say that I have been representing Josh since less than a month after this unfortunate occurrence, and, at no time, has he given me varying versions of what happened. And at no time has he waivered from the contention that Clifton Campbell put that shotgun to his head and said, "Boy, if you don't shoot up in there, I'm going to blow your head off." And he was drunk and he was mean, and he meant it, at least to Josh.

¶18.    We outlined the standards to be applied when addressing issues of the ineffective assistance of

counsel in *Holly v. State*, 716 So. 2d 979, 989 (Miss. 1993):

> In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and

7

that the deficiency was so substantial as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 674 (1984); *Wilcher v. State*, 479 So. 2d 710, 713 (Miss. 1985); *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984). This Court looks at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial. *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read v. State*, 430 So. 2d 832 (Miss. 1983). "Judicial scrutiny of counsel's performance [is] highly deferential." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Carney*, 525 So. 2d at 780; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985). Only where it is reasonably probable that but for the attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient. *Dickey v. State*, 662 So. 2d 1106, 1109 (Miss. 1995); *Reed v. State*, 536 So. 2d 1336, 1339 (Miss. 1988).

¶19. The State argues that Davis has failed to demonstrate a deficiency in his counsels' overall performance sufficient to undermine the integrity of his trial and conviction. We agree. There was testimony that Davis admitted shooting into the camp cabin and a confession stating likewise. Rushing's statements during closing presented an alternative defense theory, namely, that Clifton put the shotgun to Davis's head and ordered him to fire. There was no deficiency and no concomitant prejudice. This assignment of error is without merit.

## CONCLUSION

¶20. Finding no reversible error, we affirm the judgment of the Yazoo County Circuit Court.

¶21. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.**